May it please the Court. My name is David Pernini. I have the law firm of Wargo and French, and I'm representing the Appellant and Dialtone in this case. Your Honors, as a preliminary matter, I do want to mention in our reply brief on the appellate briefs, we cited a case in the Grompa v. Mail Coops. Subsequent to our filing of that, the case was taken en banc by the circuit, and no ruling has come from the en banc panel at this point. However, as the issues in this case are well settled by both Supreme Court authority, including a very recent case, and Ninth Circuit authority, there's no reason to delay proceeding on resolving this appeal. So you don't think we ought to wait for the en banc decision? Well, Your Honor, you certainly can wait for the en banc decision, but in that case, in the Nagropa case, the focus is solely on the question of procedural unconscionability, which, although that is an issue in this case, it's not the only issue in this case. There's also a very large issue of substantive unconscionability, which the Nagropa case has not touched in any way. So in other words, if the en banc panel adopts the three-panel decision of the Nagropa decision, then I think it will very clearly tell this Court that it must reverse the trial court. But even if it doesn't, it doesn't provide an easy – if the en banc panel does not, it does not provide an out for this Court to say, well, then we have to affirm the district court. Your Honor, this case involves a district court's denial of motion to compel arbitration. And the district court erred in this case by looking well beyond the terms of the arbitration clause, and in so doing violated the admonitions of the Supreme Court based on Prima Paint and its progeny. And Prima Paint admonishes district courts that when dealing with a motion to compel arbitration, the courts must look solely at the arbitration clause. And challenges to the validity of the arbitration clause alone are the only things that the court should consider. Challenges to the contract as a whole are off-limits to the district court. But although Prima Paint said that we can't address challenges to the contract as a whole, in this particular case under the terms of service, doesn't the unilateral modification provision go more specifically to the making and the performance of the agreement to arbitrate and such that we may take it into account? Your Honor, I would say that it does not. And part of the basis of that would be this Court's clarification of the Prima Paint decision and the Teledyne decision. As the Ninth Circuit said in that case, what the Court should determine is whether the challenge is one that is separate and distinct to the contract as a whole. In other words, if the challenge made to enforceability is one that is separate and distinct from the rest of the contract, then the district court can look at it. If the challenge is to something that affects the contract as a whole, it is off-limits to the court because it's an issue for the arbitrator. It's not that they've lost the argument. It's just they need to make it to the arbitrator. In other words, Your Honor, if you were to take the arbitration clause out of the contract, if the argument can still be made, then that argument is off-limit to the district court and is something that the arbitrator must address in the first instance. Specifically, in this case, the modification provision of the contract is not contained in the arbitration clause. If the Court were to strike entirely Section 15C of the contract so there is no arbitration clause, Net Global would still be able to argue to whatever decisionmaker was left, well, I think the whole contract is unconscionable because of this modification provision. Thank you. And that's substantive. Yes, Your Honor. That is a substantive unconscionability analysis. Your Honor, I'd like to bring the Court's attention to a recent Supreme Court decision that doesn't really modify PrimaPaint but amplifies it, and that's the Buckeye check cashing versus Cardania. This is not in our briefs. I only recently found out about it. Did you do a 28-J letter? I did not, Your Honor, because I just found out about it literally yesterday. It is a February. When did it come down? It came down in February of 2006. So it's been four months, and unfortunately, I didn't follow my Supreme Court updates. Will you submit the case to us as counsel, please? I will be happy to, Your Honor. The clerk will provide you with a sheet to do that. Okay. The citation, there's no U.S. reporter citation. It's 126 Supreme Court 1204. It doesn't help us very much now, counsel, because we don't have an opportunity to review it. Okay. Well, Your Honor, I won't belabor the case because it really doesn't do anything new with the law. It does, in that case, directed the Florida Supreme Court improperly rejected a contract which had an arbitration clause, finding that the contract was illegal and usurious under Florida law. The Supreme Court, the Florida Supreme Court said that the contract was void ab initio as illegal, and the United States Supreme Court said it was error for the court to make that determination because the challenge should have been provided to the arbitrator first. All right. But, Your Honor, what's remarkable about that case is that it is not an expansion of prima page. It is essentially a continuation of the well-settled law in that area, including as set forth by this Court in the Teledyne case. Your Honor, in this case, the Court violated the prima page admonition by finding four different areas of substantive violations, of substantive unconscionability, two of which are found outside of the arbitration agreement. The first one we've already discussed, which is the modification provision. The other provision that the Court looked at was the limitation of liability provision. Again, that's in Section 10 of the contract. Again, this is a challenge that does not go to the arbitration agreement. It goes to the agreement as a whole. And in so doing, the Court stepped into the role of the arbitrator improperly and usurped his role. Again, we're not saying that NetGlobal does not have the right to challenge that section. It's just the question of what court it should be challenged in. Your Honor, based on those two interpretations by the district court, that alone is grounds for reversal of the district court. However, Your Honors, I would believe the Court should go one step farther and actually reverse it with directions because even the analysis regarding the contents of the arbitration clause, which the Court can look at, is not proper in this case. Specifically in regards to the arbitration clause, the Court found the implicit There were four different areas of substantive unconscionability which affected the whole of the contract and not simply the arbitration clause. I'm sorry, Your Honor. You mentioned modification. You mentioned limitation of liability in Section 10. What are the other two? Your Honor, what I meant to say, and if I was unclear about this, the Court found four substantive unconscionable minors. Two of those were outside the arbitration clause. Two of them were in the arbitration clause. Those two that were in the arbitration clause is what I'm discussing now and are not unconscionable under California law. Is it your submission that the two in the arbitration clause, which are clearly in the arbitration clause, can be severed out? They can be severed out, Your Honor. I don't think they need to be severed out because they are not unconscionable under well-settled law. But they could easily be settled, severed out, and I believe in our papers we gave an example of that. But the one in the arbitration clause, isn't this the paradigm of the hidden in prolix form was 17 pages in or something in a small print, and even though you were dealing with a, quote, savvy business, it appeared very hidden to me. Okay. What is your response to that? Well, Your Honor, there's two responses. One is, and again, this is now out of the area of substantive procedure or unconscionability  When you were talking about the two in and the two out, I was going back to the two in. Okay. Well, the two in, the fact that they're hidden, that goes to procedural unconscionability. In fact, the claim that they're hidden goes to procedural unconscionability. And, Your Honor, in this case, the response to that would be twofold. One is, again, the concept of being hidden, the district court found it was hidden because it was linked to an Internet site, and that was the finding of the district court as to why it was procedurally unconscionable. That grounds is improper because it would be a violation of the E-Sign Act, which says that you cannot deny a contract validity because part of an electronic record is used in its formation. So the district court's finding of that. We're not talking about validity. We're talking about whether it's conspicuous or hidden. Right. And I'm just addressing what the district court said. As far as it being on the last page of the act. But back to the point where you said it would violate the E-Sign Act. How so? It's not saying that it's invalid. It's just, the court was just saying that because it was hidden, it's unconscionable. So that, how does that violate the E-Sign Act? Your Honor, the E-Sign Act says that you cannot, I'm sorry, let me get the actual language of it. A contract may not be denied legal effect because part of the electronic record is used in its formation. Saying a contract isn't valid because it's unconscionable is denying its legal effect. It's not saying that the effect is denied because it's in electronic format. It's saying because you have to search some place to find it. If it were in an e-mail, if it were done in an e-mail format directly, then that would be a different point. But the point here is that you have to search for it. You have to link and then go to a different site. Well, two responses to that. One is, in this case, the record indicates that the contract was e-mailed to NetCompo. Not the arbitration clause. No, the arbitration clause was hyperlinked in that e-mail. That's very clear. That's the point. But the question then becomes, California law clearly allows the parties to incorporate by reference other contracts. And that is well established in California. That is what has happened in this case. So does that make it per se procedurally? Where did the parties incorporate it by reference? Pardon? Where did the parties, both parties incorporate the hyperlink by reference? When NetGlobal signed the agreement, on the signature page of the agreement, it says this agreement is bound by Interland's terms of service, which are found at this link. So it's a very clear reference that the terms are incorporated by reference and included in the agreement. And that was on the page that he signed. It was a five-page agreement. They said this is the only page we know for certain that NetGlobal did look at because they signed it. So the question then becomes, does that make it per se procedurally unconscionable? And I would say that's not clear California law. California law does enforce incorporation by reference. I would say specifically in the context of this case, given who the parties are, it's especially inappropriate. The plaintiff in this case is an Internet company that's sold business, is sending out marketing e-mails all across the United States. It knows how to work the Internet. It knows how to hyperlink. It knows how to go to hyperlinks. So the concept of and procedural unconscionability of was there a surprise? I would note that the California Supreme Court in the Net-2 phone decision specifically indicated that in the context of Internet contracts, hyperlinking terms of service is a common practice. So it is certainly something that a sophisticated Internet company would have a common understanding that sometimes when you have a contract, there are hyperlinks to it. Okay. You can go back to your substantive unconscionability now. Thank you, Your Honor. In regards to the two elements that are in the arbitration clause, the first one has to do, the Court found that it was unconscionable because the agreement had a reference to Resolution Resources Corporation. The Court then found that was a substantively unconscionable provision because there was the possibility that the dial tone would have a repeat offender advantage. There's several problems with that, the first of which is it simply doesn't meet the standard. Under California law, for a provision of a contract to be substantively unconscionable, it has to shock the conscience. In this case, he says the mere possibility is raised. There's no evidence in the record whatsoever to support a finding that dial tone had any improper advantage with RRC. The only evidence in the record is that it is listed in there. More importantly, the Court ignored the following language in the contract which says, or such other recognized provider of arbitration services as agreed upon by both parties. But that doesn't give the other party the opportunity to veto the Atlanta company. It just says they have to agree as to some other company. Well, I would argue, Your Honor, that an interpretation could be made that it does allow them to object because it says, or another party as agreed upon by the party, implying that there needs to be agreement. So, in other words, they could say, I object to RRC. Do you stipulate that they can agree to, they have the power to veto under this? Absolutely, we do, Your Honor. Part of the reason is a practical fact, and that is RRC went out of business. Exactly. Right. So, now, they have, NET Global has raised a claim that, well, because of this, this is, there's no listing of who the arbitrator is, and this is nothing more than an unenforceable agreement to agree. This Court has already rejected that argument in another case, in the Betchell case, and basically held that if there's no identification of an arbitrator, that doesn't mean that the parties have not, do not have a binding arbitration agreement. I would also note that the FAA, the Federal Arbitration Act, specifically provides for a procedure if there is an absence of identification of an arbitrator. So, the FAA contemplates that parties may commonly not identify who the arbitrator is. Now, what do you do with the policy of the State of California as far as its judiciary is concerned, which disqualifies retired judges from sitting as superior court or California State judges if they are arbitrators for pay, on the possibility that they will favor parties who appear before them as arbitrators? Isn't that a statement of California policy? Well, Your Honor, I. Is it from mere possibility to sufficiently so that former judges of the State of California cannot sit as arbitrators if they intend to sit under designation by the Judicial Council? If I understand your argument, Your Honor, you're saying that because. It's not my argument. It's the ruling of the State of California. I'm sorry. If I understand the point you're trying to make, Your Honor, is that if the California, since California judges are not allowed to sit as arbitrators, doesn't that modify the Court's first arguments regarding RRC from a mere possibility? Your Honor, that's an interesting question. I would say that in the context of this case, the arbitrators for RRC are not California judges. There is no. But the basis, the principle basis is that the California judiciary is concerned, I guess worried is a better term, that if the people arbitrating repeat offenders, let's say. Sure. When they come to judge them, they'll be favorable to them. I understand that's the California's concern on that. What I would say when there's no evidence in this case, there's no evidence that or dial tone is such a repeat offender as it would be with RRC that would make any difference. A similar challenge could be made if you said I'm going to do an arbitrator with the triple A. Well, triple A, as we know, is a very large corporation. And one company's involvement or choosing of the triple A is not going to mean that that company has an advantage with the triple A because the chance of the triple A, a nationalized corporation, is going to care that much about one small player is minor. That's the evidence that is missing from this case. They have presented no evidence that, assuming RRC still existed, that dial tone had any advantage in that case. I'm going to go to the second line. Yes, and that is the choice of the form, and that is Atlanta, Georgia. Your Honor, in this case, they found it was unconscionable to have the defendant travel to Atlanta, Georgia. And the facts of this case, that is simply not supportable. California law routinely enforces form selection clauses. They are per se valid under California law. In this case, we have an Internet business. NetGlobal is a Nevada corporation, actually. It happens to have its principal place of business in California. It operates businesses all over the United States. In fact, under the facts of this case, its main asset was this database of e-mails. That database was located in Dial Tone's facilities on the East Coast. So it's certainly not unreasonable or improper to expect that Dial Tone would know what might have to go across the United States to arbitrate its claims. Finally, Your Honor, the court erred, and we talked about this a little bit, in finding that the contract was procedurally unconscionable. We have discussed a little bit about the provision of being hidden. I would also add, Your Honor, that in doing that, the court still violated the Primer-Paint directive by looking at a challenge to the contract as a whole rather than to just the arbitration clause. The claims of procedural unconscionability would still exist if you were to delete the arbitration clause in its entirety, and therefore the claim is not separate and distinct from any claim to the rest of the contract, and it's a matter that the arbitrator should decide. As a final matter, this is not a question of limiting NetGlobal's right to justice, limiting their right to make any of these arguments. This is a question of the congressional intent to allow arbitrators to make decisions as well as courts. That's what the Supreme Court said 30 years ago, and that's what we're asking this court to say today, and that is to say to the district court, you really need to look just at the arbitration clause. In this case, the clauses are clearly not subsidy and unconscionable. The analysis of procedural unconscionability is wrong, and so you should dismiss the case. I would add, Your Honor, that under the Teledyne decision of this court, dismissal of a case on a motion to compel arbitration is a proper outcome. Is a what? Is a proper outcome. Oh, okay. I have two minutes, which I'd like to reserve for rebuttal unless there's any other questions. All right. Good morning. May it please the Court, opposing counsel, In view of the fact that the Nagrampa decision is no longer can be cited as precedent, I think what we're left with is the remaining rule in the Ninth Circuit, which is expressed by Ticknor and also by Ting, a case I didn't cite, at 319 Federal 3rd, 1126. In both of those cases, the Ninth Circuit examined the actual effect of the surrounding circumstances on the unconscionable arbitration provision. And in particular, even though those circumstances affected the rest of the contract, such as not being able to find the agreement because it's enclosed in an envelope, et cetera, nevertheless, that could still be thought to bear on the arbitration clause in particular. And I point that out because in this case, as already questioned, the service agreement was not merely the additional service agreement. That is not part of the original contract was not only just tucked away in an envelope. It was actually tucked away in the cyberspace. What happened was they email a hard copy. The agreement says you have to actually do a wet ink signature on the hard copy, mail it back and fax it back. And it's on that hard copy that you find a reference to a to a address in cyberspace, which is 12 stroke. Excuse me, 72 strokes to find it. If you get there. I can't even get through on piece or often, which is just six. But your client can. I mean, your client is global marketing. They are in the cyberspace business. We don't have here somebody who just walked in and looks at a computer and says, is it a television set? Right. But it was called that provision that was referenced was referenced as a service provision. And specifically, it says where you will find a disclaimer of liability and waiver on on certain other items. Limitations of liability. Yeah. But says nothing about arbitration being found in that location. But the assumption was that it would be read. In fact, your client signed is its name, that it had read the terms of service in the document. In that regard, Your Honor, as a matter of fact, if one reads the agreement closely, it says the agreement is not even effective until signed by dial tone and dial tone never signed the agreement. I mean, there is a whole problem of whether they even get to that. But point of fact is, Your Honor. Did you order that in your briefs, that there's no agreement? Yes, Your Honor. I did reference it, I believe. And in the district court? And I believe we also cited it to the district court. So you made the argument to the district court that there really was no agreement because dial tone never signed? To be candid, I believe I did because I've known it. I don't recall what's in the written brief. But the district court did not rule on that. Did not rule on that. That's correct, Your Honor. I also want to point out that in regard to the to that procedure is what they are now suggesting is, is that if you go through all that procedure and you actually get to the 12th page of the 17 pages and the fine prints, not in bold print, as other provisions may have been. When you get there, what they're now suggesting, since there is no actual arbitrator, it was a one man arbitration selection. What you now should do is go file a lawsuit in the federal court, ask the federal court to fashion a remedy, to rewrite the contract, to set up a procedure for finding an arbitrator, then go to that arbitrator and have that arbitrator decide whether the clause is unconscionable. Wait a minute, Mr. Siegelman. Were you here when the opposing party stipulated on the record as a judicial admission that the Atlanta arbitrator resolution resources cannot be the arbitrator unless you agree to it? That's what he stated, Your Honor. Well, then part of your argument is gone, right? I mean, if I don't agree, there is no arbitrator. That's correct. You have to agree to the arbitrator, either the Atlanta outfit or some other outfit, whether it's AAA or whatever. So the identity of the arbitrator is subject to your approval. You have a veto right. What's unconscionable about that? Well, in actual fact, I believe, Your Honor, the language in the contract says we select resolution resources. That was our selection. We're no longer at that. That's no longer the operative. Or, or, as far as we agree. And he says the way to interpret that is to allow you a veto both as to resolution resources and of any other person. So that's yesterday's issue, right? Well, but for the fortuity of the fact that arbitration resources, as the district court said, are no longer in business. Otherwise, I'm stuck with arbitration resources. It says arbitration resources. But he says that you're not stuck with them if you don't agree to them. He's so stipulated as a judicial admission, an open argument before this court and all these people. But, Your Honor, I don't believe that that's the way the clause reads. The clause reads you do have arbitration. How are you hurt if that's the way he stipulates the court? The clause reads. As to what his stipulation was. I mean, you don't like the stipulation tactically. Okay, fine. I'll stipulate to that. Right. Okay. But but I also believe. But you don't deny it. Right. I don't. Certainly not. And in regard to that, looking at the actual clause itself, the actual arbitration clause, not the entire agreement. It's significant as they themselves when they recite the clause that you have a combination, as you had in the tin case. You have a combination of, in the tin case, it was secrecy with confidentiality. So only they would know what the history is of that arbitrator. Here we have a provision that there's no written arbitration decision if the amount to be awarded by the arbitrary decides it's less than $100,000. That doesn't affect you because if you win, you get a million and a half. You get a written opinion. And if you lose, you get a zero. But I believe, Your Honor, under the analysis that what I've just recited, particularly in Ting, what's unfair about that in general is the fact that only they know how that arbitrator reacts because there's all the decisions because of the limitation of remedy. In this case, no remedy for destruction of data, no remedy for loss of profits capped. Even if there's anything left capped by one year's fees, no matter how long you've been with us. So it's not going to go above $100,000. Therefore, there will never be unlikely that there'll be written decisions. But because they have the comeback advantage, they know alone how that arbitrator works. Unlike other arbitration associations where you have written decisions, you're able to research, you're able to find out what are those circumstances. At least that's what was pointed out in the tin case. The limitations on remedies apply whether it's arbitration or whether it's tried. Right. It goes to the contract, not the arbitration clause. And their knowledge of how the Atlanta arbitrator works has just been nullified 10 minutes ago, because if you don't like that arbitrator, you don't have to take them. Next, please. Well, Your Honor, one of the questions that was asked in that regard was the fact is that, you know, are we even aware of those circumstances? Are we aware of their stipulation until today? So when we asked, the question was asked, when you signed the agreement, didn't you know the consequences? I don't believe we did. And indeed, Your Honor, in fact, we never even were aware of the clause. But in fact, Your Honor, we had proceeded, as a matter of fact, by filing a lawsuit until this whole matter came up. I also would like to point out that. Taking a look at the general circumstances that surrounds the arbitration clause and how those circumstances bear on the arbitration clause, you know, the limitation of remedy bared specifically on that provision I just mentioned about the hundred thousand dollar limit before a written decision is required. And there was also the the fact that has been brought up that we negotiated California to Florida, Florida company, to our knowledge, the data stored in Florida, only people we dealt with in Florida. The address on the agreement is Florida. It specifically says to return it to Florida. And now all of a sudden we're found that we're supposed to be in in Georgia. Suppose we strike the we sever the venue clause. I mean, Florida is really not that far away from Georgia to start with. Probably closer than San Francisco. Right. But but but that that arbitration clause itself states that the arbitration will be in Georgia. Right. But if it's if it's stricken, it's it's considered severable. If we remand with instructions to consider the clause severable, that solves that problem. It solves the problem as to where where it would take place. Yeah. And indeed, Your Honor, this is not like the comparison they make to, say, Triple A or Triple A looks at the circumstances, looks at the evidence and decides where the best place is. Certainly the best place would have been California or Florida. That's where the that's where the evidence. I understand your position on the grandpa. Grandpa's up in the air because the in-bank panel hasn't come down yet. But why aren't we bound by prime of paint? Well, Your Honor, I think under the Nagropa decision, if I may address that under the I mean, I was on the set of ratings on my grandpa panel. Yes. Under the under the considerations in that matter. I believe that the prime of paint, as construed by this court up till the time of Nagropa, made the federal court the gatekeeper and the federal court had an opportunity to take a look at it. It's not taken away from them. And to take a look at the surrounding circumstances that pertain, including the actual written documents that pertain to that clause. And I think that that's an obligation that throughout Circuit City, throughout Ticknor, throughout Ting. That's what this Ninth Circuit has always done. And I point out that in Ticknor, you had a sophisticated plaintiff. This was a businessman. Whereas in this case, you have a two person operation operating essentially out of their home. Indeed, Your Honor, you can't make a distinction because the same effect would take place if this was a patient of a hospital. This was a customer on the Internet buying something that would be retail. All those considerations still come into play, whether it's a person who's engaged in business and buying or whether it's a person who's individually buying. What's your client's real objection to arbitration? Fair enough, Your Honor. First of all, I believe that the real objection is the fact that that a they're comfortable in court. I think most parties are. I have seen the dark side of arbitration. I've seen a very dark side cases of that should last five days, last 50 days. An arbiter collecting a quarter of a million dollars in arbitration fees. The expense of arbitration is horrendous today. Thirty five hundred dollars a day. And and you don't take a set of depositions. You do everything in arbitration with the arbiters sitting there. I've seen an extremely dark side of what comes out of arbitration. I think the judge wasn't being fair in the sense to both parties. But there's also other agendas that have now come into play. And that, in matter of fact, in arbitration, as it's now conducted to throw the dice, there is no precedent anymore. We never know what's happening in arbitration. And I tell that to people. And I think that's the primary concern. At least when you go to court, you know some bright lines. You have a fairly good idea of what's going to happen and you can advise the client. And arbitration, you popularly now said it is, as they say, a crapshoot. Just don't know how you're going to what's going to happen. Arbitration arbiters can do whatever they please. Now, for the most part, did your client object in any way to the arbitration clause in the formation of the contract? No, he was not even aware of it. None whatsoever. Your honor. He I believe the evidence shows and I believe the district court indicated it faxes to him with the statement. Shoot it right back. He signed it and sent it right back without without accessing the hyperlink. That's right. It's not a hyperlink where you can click and go. You have to type it in, type it in. You go to your computer and type it in. No question. You could do that. I'm not sure about everyone. I have difficulty getting your client who markets in the Internet. You think it's unconscionable to require him to type in the name of that URL site and go to it and read it. And it's OK for him to accept his site on completely unread and have it stricken because I didn't read it. I don't I think that you would be correct. But in particular circumstance, your honor, where what he's relying upon is his perception of what can who he's dealing with, if somebody in Florida and to say to shoot it right back to us and looking if you look at the agreement, it just says the terms of service service as on the Internet, not terms of service. Nothing beyond that. And here we're talking about now what happens if you have a claim? Well, that's what was giving a service, right? It's the terms of dial tone service. Well, I think a perception is that it's the terms of service and sensors, a great deal of technical material on the underlying agreement. Now, how they were going to operate, how they were going to provide information, how you can load and unload from the computers, et cetera. You know, anyone who buys anything on the Internet or gets a license, it terms of service is one of the terms of art that tells you what the conditions are of using the whatever service you are using. So your client would have known that being in the Internet field would have known that terms of services is a term of art and gives you the conditions. I'm not I can't believe he your client. It wouldn't know that that was a very important hyperlink to read before agreeing to the agreement, finalizing the agreement. Your Honor, he did not know. But more importantly, in general, the whole reason that businesses do it this way is not to make it easy to know, to make it difficult to know. Otherwise, they would have just put it in a written agreement. And that might be true for as just being pointed out for someone who's not familiar with the confines of cyberspace and negotiating and contracting. But if you do that on a regular basis, are you saying he wouldn't know? Well, I am saying, Your Honor, I think that that you can't make a transition. And there's almost no distinction of going from him and anybody else who would be buying something. But don't we look at the sophistication of the party involved? We don't look at this in a vacuum, do we? Well, Your Honor, I do believe that even if you look at the sophistication of the party involved, I think it's it's and I don't I think you come out either way. You're going to affect a lot of other people if you say, well, this guy's a one person business, two person business. He's he can go one way. And somebody else who's ordering a car over the Internet. The consequences are different. I think that's a hard line and where you draw that now. And that's the line that always draw between the relative bargaining power of one party and another power on the question of confidentiality. Well, it has to be. And indeed, Ron, in the bargaining power here, you're dealing with dial tone and the knowledge and sophistication. Just another element of bargaining power. Well, I'm saying you are dealing with dial tone, which was a national one of the largest national companies, a provider of storage on the Internet. Whereas so they're a large company. This is a take it or leave it agreement, which is one of the things that's looked at in the in the technology team that we know is take it or leave it. Was there any effort made to negotiate or to say, I don't like this? How do we know it was take it or leave it? Yes, your honor. The there was there was no effort unknown. It was not negotiated. And one of the things was there an effort to negotiate that your clients say, I don't like this term. I don't like this term. You know, I I don't want this contract. But if I don't want this contract, what happens? We don't know that. Yeah. Yes. There was none. In fact, your honor. So we don't know that it was a take it or leave it contract. We know it was a boilerplate contract, but that's different than a take it or leave it contract. Based upon the state of the pleadings, your honor, there's certainly nothing to indicate that there was any or the state of the evidence. There was nothing to indicate that this was a negotiated agreement in this situation. And that's not the question. Yes. Was there an attempt to negotiate? No. And one last thing I want to point out in the citation to the Bechtel case in particular, in that case where the court said, hey, you guys didn't agree on the arbitrator. This is a labor dispute. We have to keep a labor piece. You guys know every time when you agree on these agreements, there's an arbitration provision. Come on, we'll fashion it for you. That's not the situation where it's unknown that there is the arbitration provision and we're there. They intentionally left it blank on the contract. And one last thing. And that is that there's just no expectations here of what you got the hard copy and did. And they asked for an ink signature. There's no expectations that you're dealing with click and point type of circumstance. I can see from the lawsuit recommendation.  But we cannot here if you are in one agreement with this. Whereas if you were in one messenger on the Internet and I indicated California law that you can't mix messengers under their statute. You can't say here's a form agreement, by the way, some of it is also an Internet agreement that there should be one way in which you know where you're at. And I provided the citation, which is not inconsistent with the federal law. Are California cases consistent on that? Aren't there a number of California cases that go back and forth on that issue? There's actually there was a California statute that I cited. And to my knowledge, there have been no cases that have construed the California statute. But there was a recent statute which I cited in my brief that says if you're working on on a form hard copy contract, you can't also combine Internet or electronic means. And it was the recently passed. So would that violate the E-Sign Act as opposing counsel argued? I didn't quite catch it. I'm sorry. Would that statute violate the E-Sign Act, the electronic act or Congress saying that a contract can't be invalidated simply because it's on an electronic means? Yeah, I briefed the point, Your Honor, that it's not inconsistent with the federal act because of the fact that you're not conducting it purely by electronic means. You're conducting this one by hard copy ink signature U.S. Thank you, Counsel. Rebuttal. Thank you, Your Honor. Just briefly, first of all, in regard to the lack of a signature, the claim of a lack of a signature by dial tone, that issue was not raised in the district court. The only challenge to the district court was a claim of unconscionability. So it's not properly before you today has to the degree. It's an issue that has been waived at all times in this litigation. They've admitted there's a contract. So and that's the first question. They admitted there is a contract. We're saying you shouldn't force it, which leads you indirectly into payment pain. I would mention two other minor things. One in regards to Atlanta, Georgia, being improper in the net global case, or I'm sorry, in the net to phone case. Mr. Segelman mentioned that, you know, it's really tough for consumers. Net to phone was a consumer case, and the California Court of Appeals said it's appropriate to let those consumers go to New Jersey to litigate their claims. So certainly having a sophisticated internet business come to Atlanta, Georgia is not going to be so invalid under California laws to make the clause unconscionable. It is still a per se valid form selection clause and should be enforced. And just as a last point on the California statute that Mr. Segelman cited, I want to read the language from it because it does not say exactly what he says. The actual language is an agreement to conduct a transaction by electronic means may not be contained in a standard form contract that is not an electronic record. That has not been interpreted by any court, but I would make two notes on it, two notes about it. One is the very next statute, which is 1633.7, follows the e-sign act and says a contract may not be denied legal effect or enforceability solely because an electronic record was used in its formation. So his concept that you can't have a signed contract, an electronic contract is directly contradicted not only by the e-sign act, but by the California act. And the final point, Your Honor, electronic record is defined as any record that is transmitted by electronic means. The record is clear in this case, the contract was emailed and faxed to him. So under the very act, we don't have a standard form contract only in written form. It was an electronic record. All right. Thank you, counsel. Thank you to both counsel for your argument in this case. United States versus Gonzalez. Mayola has been submitted on the brief.
judges: Dw Nelson, Rawlinson, Bea